1
2
3
4
5
6
7
8

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING (SEATTLE)**

9

| | |
|---|---|
| SRIRAM KRISHNAN, an individual, | |
| Plaintiff, | **Case No. _____ SEA** |
| v. | **COMPLAINT FOR DAMAGES AND JURY DEMAND** |
| CAMBIA HEALTH SOLUTIONS, INC., an Oregon Company; and REGENCE BCBS OF OREGON, an Oregon Company, | |
| Defendants. | |

10
11
12
13
14
15
16
17

18      Plaintiff Sriram Krishnan ("Krishnan" or "Plaintiff"), by and through his undersigned

19  attorneys of record, Vera P. Fomina and Gregory M. Skidmore of Skidmore│Fomina, PLLC,

20  alleges as follows:

21                              **I.    PARTIES**

22      1.1.    Plaintiff is a citizen of the United States and an individual residing in King County,

23  Washington.

24      1.2.    Plaintiff is a former employee of Cambia Health Solutions, Inc. ("Cambia") and

25  Regence BCBS of Oregon ("Regence").

26

COMPLAINT FOR DAMAGES - 1

**SKIDMORE│FOMINA, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, WA 9154

1.3.    Defendant Cambia is and was, at all times material hereto, a company incorporated in the State of Oregon.

1.4.    Cambia conducted business in Washington State, including King County.

1.5.    Defendant Regence is and was, at all times material hereto, a company incorporated in the State of Oregon.

1.6.    Regence conducted business in Washington State, including King County.

1.7.    Defendants were at all relevant times Plaintiff's employers pursuant to RCW 49.48 and 49.52.

## II.    JURISDICTION AND VENUE

2.1.    This Court has jurisdiction over the parties because all parties are believed to reside and/or transact business in King County, Washington.

2.2.    Venue is proper under RCW 4.12.025 because Defendant transacts business and/or resides in King County, Washington.

## III.    FACTUAL ALLEGATIONS

3.1.    On or about April 26, 2016, Mr. Krishnan was hired by the Defendants to work for Cambia as a Director of Data Governance reporting to Chief Artificial Intelligence Officer (CAIO) of Cambia Ang Sun.

3.2.    Mr. Krishnan's performance was good and by the end of 2016, he was promoted to Director of Data Governance and BI and received a salary increase.

3.3.    During the annual performance review on or about February 1, 2017, Mr. Sun told Mr. Krishnan that he was performing exceedingly well and that he was going to be promoted to Vice President. Mr. Krishnan also received a salary increase.

3.4.    On or about September 4, 2017, Mr. Krishnan was promoted to Vice President of Data Technologies & Governance.

COMPLAINT FOR DAMAGES - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

3.5.    At that time, Mr. Krishnan was given two additional teams to manage and received another salary increase.

3.6.    During the annual performance review on or about February 1, 2018, Mr. Sun provided Mr. Krishnan with an exceeding performance review and another salary increase.

3.7.    On or about March 16, 2018, Mr. Sun left Cambia and Mr. Krishnan started reporting to the interim CAIO Derek Weiss.

3.8.    In August 2018, Jared Short and Mr. Weiss told Mr. Krishnan that he was performing well but that they would like to leave the promotion decision up to the new CAIO of Cambia, Faraz Shafiq.

3.9.    Effective September 2018, Mr. Krishnan began reporting to Mr. Shafiq who became CAIO of Cambia.

3.10.    On or about February 2019, during the annual performance review, Mr. Shafiq stated that Mr. Krishnan's performance was exceeding expectations, that he would receive a 3.5% salary increase, and that he was on the right path for promotion for Chief Data Officer.

3.11.    In or about March 2019, Mr. Shafiq told Mr. Krishnan that they needed to be very careful and start documenting everything with the new Vice President of Data Science, Ahmer Inam, because Mr. Inam had filed a lawsuit against his former employer.

3.12.    On or about April 1, 2019, Mr. Krishnan received a positive performance review and his 3.5% salary increase became effective.

3.13.    On or about June 2019, Mr. Shafiq told Mr. Krishnan that he was grateful that Mr. Krishnan was employed with Cambia, that he was happy with Mr. Krishnan's performance, and promised Mr. Krishnan a promotion to Chief Data Officer.

3.14.    Shortly thereafter, Mr. Shafiq informed Mr. Krishnan that he had discussed a $20,000 salary increase for Mr. Krishnan with Cambia's Chief Operating Officer Jared Short.

3.15.    On or about June 2019, Mr. Inam left Cambia.

COMPLAINT FOR DAMAGES - 3

3.16.    On or about July 1, 2019, during a meeting with Mr. Krishnan in Seattle, Mr. Shafiq said he had been appointed as a technical advisor to Abacus Insights ("Abacus") and he would be attending its board meetings.

3.17.    Upon information and belief, Cambia has invested in Abacus through its subsidiary "Echo Health Ventures", which is co-owned by Cambia.

3.18.    Upon information and belief, CEO of Cambia Mark Ganz wanted to improve the valuation of this investment and giving a huge project to Abacus from Cambia would increase the value of Cambia's investment, which would make Mr. Ganz to look good.

3.19.    Mr. Krishnan reasonably believed that it was illegal to funnel member's dollars to a for-profit company, without going through proper RFP processes.

3.20.    During the same meeting, Mr. Shafiq also stated he wanted to ensure projects were given to Abacus, in hopes he would then be appointed to Abacus's Board of Directors.

3.21.    During the same meeting, Mr. Shafiq stated this hoped for position at Abacus would provide him with an additional $100,000 in annual compensation.

3.22.    During the same meeting, Mr. Shafiq also told Mr. Krishnan that if the then-pending BCBS North Carolina merger was successful, he might not be selected to run the combined data/AI teams.

3.23.    During the same meeting, Mr. Shafiq elaborated further that BCBS North Carolina already had a strong leader who would likely end up leading any such combined team created by the merger, which would effectively leave Mr. Shafiq jobless.  In order to eliminate that possibility, Mr. Shafiq intended to leverage this critical relationship with Abacus in order to secure a position at a post-merger Cambia.

3.24.    Mr. Shafiq also mentioned that since Echo Health Ventures, which is owned by Cambia has invested in Abacus, it would be easy to get approvals from Mr. Short and Mr. Ganz for this project.

COMPLAINT FOR DAMAGES - 4

3.25.    On or about July 19, 2019, Mr. Shafiq held a data strategy meeting with Mr. Krishnan and several other managers.

3.26.    During the meeting, Mr. Shafiq announced that he was going to give Abacus $30M over the next five years.

3.27.    Mr. Shafiq could not singlehandedly approve allocating $30M to Abacus.  To do so, he needed approval of the COO Jared Short and CEO Mark Ganz.

3.28.    Because no such approval had been obtained, Mr. Krishnan believed that illegal activity was afoot and that Mr. Shafiq, Mr. Short and Mr. Ganz derived financial benefit from this transaction.

3.29.    It was Mr. Krishnan's understanding that Cambia maintained and enforced a non-retaliation policy, protecting those who, in good faith, report suspected wrongdoing related to the allocation of company resources.

3.30.    Mr. Krishnan immediately questioned this allocation of Defendants' funds because the required RFP process had not been followed and because Abacus's data platform had not been properly vetted.

3.31.    Mr. Krishnan believed that the allocation of Defendants' funds were illegal and that the government funds and the funds of private individuals who were Defendants' paying members were improperly used for personal gain of the Defendants' executives.

3.32.    Mr. Shafiq did not answer Mr. Krishnan's questions and, during the meeting, messaged Mr. Krishnan to take this discussion offline.

3.33.    Shortly thereafter, Mr. Shafiq began retaliating against Mr. Krishnan by excluding him from the BCBS North Carolina merger meetings and conspicuously avoiding all further mention of Mr. Krishnan's previously-discussed promotion.

COMPLAINT FOR DAMAGES - 5

3.34.    Since August 2019, Mr. Krishnan's colleagues expressed their concerns of Mr. Shafiq's retaliatory behavior against Mr. Krishnan and mentioned that they had made complaints to Cambia's Ethics department about Mr. Shafiq's misconduct.

3.35.    On or about August 5, 2019, Mr. Krishnan met with Cambia's Senior Associate General Counsel Lisa Oman to report his concerns related to Mr. Shafiq, including concerns regarding: (i) failing to follow the appropriate procedures necessary to allocate funds to Abacus; (ii) excluding Mr. Krishnan from the merger meetings with BCBS North Carolina; (iii) committing tax fraud by misrepresenting his purported relocation to Seattle; and (iv) providing preferential treatment to employees who did not complain about these illegal activities.

3.36.    Shortly thereafter, Mr. Shafiq misrepresented to Mr. Krishnan that senior leaders at Cambia did not like him and that he was not going to get promoted.

3.37.    Mr. Shafiq also told Mr. Krishnan that there was no further career growth for him at Cambia, that the data architecture team Mr. Krishnan had overseen would be reporting to Mr. Shafiq, and that Mr. Krishnan should leave Cambia and take an exit package.

3.38.    On or about August 30, 2019, Mr. Shafiq indeed removed the data architecture team from Mr. Krishnan and made that team report to him directly, thereby weakening Mr. Krishnan's ability to prevent Mr. Shafiq from directing Cambia's projects and funds to Abacus.

3.39.    On or about October 16, 2019, Mr. Shafiq offered Mr. Krishnan to choose between the two options: (i) leave Cambia voluntarily; or (ii) be placed on a Performance Improvement Plan (PIP) and then be fired by December 2019. Mr. Krishnan did not accept either one of the options, as both were undeserved and retaliatory.

3.40.    On or about October 23, 2019, Mr. Krishnan again alerted Mr. Shafiq and other direct reports about the possible unlawful activity of selecting Abacus as a vendor without following the appropriate RFP processes.

SKIDMORE | FOMINA, PLLC
1001 Fourth Avenue, Suite 3200
Seattle, WA 9154

3.41.    Mr. Shafiq called for a meeting in which Director of Sourcing Jerry Spokes said they usually go for RFP processes, but in this case, Mr. Shafiq and CIO Mr. Rotival made an exception.

3.42.    Mr. Krishnan said he was not aware of any exception policy.

3.43.    Mr. Krishnan also stated that it was against Cambia's supplier sourcing policy of giving such a big project to a new vendor who is unproven, and it was unlawful to bypass RFP processes in this case.

3.44.    In this meeting, Mr. Spokes said he will email Mr. Krishnan about the exception policy and processes.

3.45.    Mr. Spokes never sent the email despite Mr. Krishnan's follow up email.

3.46.    On the same day, Mr. Shafiq informed Mr. Krishnan that he would be reassigning three of Mr. Krishnan's teams.

3.47.    By October 25, 2019, Mr. Shafiq had reduced Mr. Krishnan's total reports by over 70%.

3.48.    On or about November 1, 2019, Mr. Shafiq informed Mr. Krishnan that his employment with Cambia was terminated due to Mr. Krishnan's poor performance, lack of leadership, loss of trust and negative feedback from others.

3.49.    Defendant terminated Mr. Krishnan because he complained regarding the activity which he reasonably believed to be unlawful.

3.50.    Defendant's actions and omissions caused Plaintiff damages in the amount to be proven at trial.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Wrongful Termination in Violation of Public Policy**

4.1.    Plaintiff re-alleges and incorporates herein the preceding paragraphs of this Complaint.

COMPLAINT FOR DAMAGES - 7

SKIDMORE | FOMINA, PLLC
1001 Fourth Avenue, Suite 3200
Seattle, WA 9154

4.2.    Washington and Oregon statutes and common law require officers of a public benefit corporation to discharge the officer's duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the officer reasonably believes to be in the best interest of the corporation (*See* O.R.S. § 65.377(1) (describing the fiduciary duties of a public benefit corporation officer); *cf.* O.R.S. § 60.357(1) (using identical language to describe the fiduciary duties of a for-profit corporation officer); RCW § 23B.08.420(1) (describing the fiduciary duties of a corporation officer). Each of the three aforementioned statutes require the fiduciary to act in the best interest of the entity, a fundamental aspect of the duty of loyalty directors and officers owe to their corporations. At its core, the duty of loyalty prohibits directors and officers from using their positions to advance their own personal interests. Generally, the duty of loyalty forbids any action that subordinates the best interests of the corporation to a director or officer's personal motive, unless it is fair to the corporation and all material facts are disclosed. When directors and officers hold an undisclosed personal interest in an action, it cannot be presumed they acted in the "best interest of the corporation."

4.3. The Anti-Kickback Statute (the "AKS") a criminal statute that reads in relevant part as follows:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both

COMPLAINT FOR DAMAGES - 8

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b).  Actual knowledge of a violation under the AKS, or the specific intent to commit a violation of the AKS, is not necessary for conviction under the AKS. Cambia may be held vicariously liable for Mr. Shafiq's actions which constitute a violation of the AKS. Boise Dodge v. U.S., 406 F.2d 771 (9th Cir.1969) (a corporation through its agents may be convicted of a crime requiring knowledge and willfulness). The fact that Mr. Shafiq acted contrary to Cambia's stated policies does not absolve Cambia of liability. United States v. Beusch, 596 F.2d 871, 878 (9th Cir.1979) (finding that a corporation may be liable for acts of its employees done contrary to express instructions and policies.).

4.4.     A violation of the AKS is a per se violation of the False Claims Act (the "FCA"). 42 U.S.C. § 1320a-7b(g) (a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]).

4.5.     Plaintiff observed activity that lead him to reasonably believe that the aforementioned statutes and policies were being violated and that the transaction at issue was contrary to these statutes and policies.

4.6.     Plaintiff voiced his concerns regarding the legitimacy of the transaction.

4.7.     Defendant discharged Plaintiff for inquiring about the illegal activity.

4.8.     Any purported reason for termination by Defendant is mere pretext and Plaintiff's protected conduct was nevertheless a motivating factor in his termination.

COMPLAINT FOR DAMAGES - 9

4.9.    Defendant cannot meet its burden of proof in showing an overriding justification for Plaintiff's termination.

4.10.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe economic and non-economic damages, all in amounts to be proven at trial.

### SECOND CAUSE OF ACTION
### The False Claims Act Retaliation Claim – 31 U.S.C. § 3730(h)

4.11.    Plaintiff repeats and realleges each of the allegations contained herein above and incorporates the same herein by this reference.

4.12.    Under the FCA, employees are protected from being discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under the FCA, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under the FCA, and shall be entitled to all relief necessary to make the employee whole. 31 U.S.C. § 3730(h).

4.13.    To prove a claim under 31 U.S.C. § 3730(h), plaintiff must prove that: (1) the employee must have been engaging in conduct protected under the Act; (2) the employer must have known that the employee was engaging in such conduct; and (3) the employer must have discriminated against the employee because of such employee's protected conduct. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

4.14.    31 U.S.C. § 3730(h) protects employees who have acted "in furtherance of an action" under the FCA. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). Specific awareness of the FCA is not required. *Id.* Plaintiff only needs to be investigating matters which are calculated, or reasonably could lead to a viable FCA action. *Id.*

4.15.    Proving a violation of the FCA is not an element of a § 3730(h) cause of action. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 n.1, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005).

COMPLAINT FOR DAMAGES - 10

4.16.    Plaintiff has engaged in conduct protected under the FCA by investigating and voicing concerns to his supervisors of the transaction by and between Cambia and Abacus that may be a violation of the AKS, which could lead to a viable FCA action as any violation under the AKS is a *per se* violation of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

4.17.    The employer was aware of Plaintiff's conduct which was protected under the FCA. Mr. Shafiq, as CAIO of Cambia, as agent on behalf of Cambia, has known that Plaintiff was engaging in such conduct because Plaintiff voiced his concerns about the transaction between Cambia and Abacus at numerous meetings with Mr. Shafiq. Plaintiff also reported to Cambia's Senior Associate General Counsel about concerns of allocating funds by Cambia to Abacus, from which Mr. Shafiq would receive illegal remuneration potentially in violation of the AKS, which in turn is a potential violation of the FCA.

4.18.    Lastly, Plaintiff was discharged after Mr. Shafiq became aware of Plaintiff's concern and questioning around Cambia's allocation of funds to Abacus. Cambia engaged in discriminatory and retaliatory activities against Plaintiff. Plaintiff was discriminated through being terminated by Cambia, directly and proximately, due to Plaintiff's protected conduct under the FCA, including Plaintiff's investigation into and reporting about facts relating to the illegal transaction between Cambia and Abacus, in furtherance of a viable action under the FCA. *See U.S. ex rel. Hopper v. Anton*, 91 F.3d at 1269-70 (finding that termination was in retaliation for employee's protected conduct).

4.19.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered severe economic and non-economic damages. Plaintiff is entitled to all relief necessary to make Plaintiff whole under 31 U.S.C. § 3730(h), including, without limitation double back pay, interest on the back pay, front pay, lost benefits, any compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**SKIDMORE│FOMINA, PLLC**
1001 Fourth Avenue, Suite3200
Seattle, WA 9154

## V.    JURY DEMAND

5.1.    Plaintiff requests a trial by jury on all issues so triable.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment in his favor and for relief as follows:

6.1.    Economic damages for unpaid and lost wages, including back pay, front pay, and lost benefits, all in an amount to be proven at trial;

6.2.    Damages for actual, consequential, and incidental damages as alleged herein or as proven at trial OR reliance damages;

6.3.    Damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, and humiliation;

6.4.    Exemplary damages pursuant to RCW 49.52.070;

6.5.    Prejudgment and post-judgment interest in an amount to be proven at trial;

6.6.    Compensation for any tax penalty associated with a recovery;

6.7.    Reasonable attorneys' fees and costs pursuant to RCW 49.48.030 and RCW 49.52.070 and as otherwise allowed by any other statute or claim alleged herein;

6.8.    Any and all relief necessary to make Plaintiff whole under 31 U.SC. § 3730(h), including, without limitation double back pay, interest on the back pay, any compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

6.9.    Any other relief this Court shall deem just and equitable.

DATED this 11 day of March, 2020.

*/s/ Vera Fomina*

_____
Vera P. Fomina, WSBA #49388
Gregory M. Skidmore, WSBA #47462
*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES - 12